

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

TERRY HINTON,

    Plaintiff,

v.                          Civil Action No. 3:15cv569

VIRGINIA UNION UNIVERSITY,

    Defendant.

### MEMORANDUM OPINION

This matter is before the Court on Defendant Virginia Union University's MOTION TO DISMISS COMPLAINT (Docket No. 3). For the reasons stated below, the motion will be granted in part and denied in part.

### BACKGROUND

Plaintiff Terry Hinton ("Hinton") filed this action against Virginia Union University ("VUU") alleging four counts: (1) a Title VII sex discrimination claim; (2) a Title VII retaliation claim; (3) a Title VII retaliatory harassment claim; and (4) an Equal Pay Act claim. (Compl., Docket No. 1). The factual allegations forming the basis for these claims are set out as they are pleaded in the Complaint, according all favorable inferences to the Plaintiff.

Hinton, an openly gay male, has been employed as an administrative assistant at VUU since October 2006. (Compl. ¶¶

4-6). In early 2008, Hinton provided deposition testimony and a declaration in support of a former VUU professor who filed a Title VII religious discrimination claim against VUU; the case was "resolved." (Compl. ¶¶ 7, 9). In 2008, Hinton also filed his own Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"); the complaint was "resolved." (Compl. ¶¶ 8-9).

Hinton alleges that he was (and is to this day) paid less than his fellow female administrative assistants, noting that he is "the only male administrative assistant in VUU's Academic Affairs Department and is paid less than the four most comparable female administrative assistants in the Department. Indeed, three of the four individuals have less seniority than Hinton and the fourth has only been with VUU for one more month than Hinton." (Compl. ¶ 20). "There are no differences in seniority, merit, quantity or quality of production" between Hinton and the female administrative assistants, and "[t]he only meaningful difference between the four comparable VUU administrative assistants" and Hinton is the difference in gender. (Compl. ¶ 20). In May 2013, Hinton "raised the issue of unequal pay to his then-supervisor," complaining specifically that his "female comparators were paid higher wages than he was." (Compl. ¶ 22). That unnamed supervisor informed Hinton

2

that VUU would not increase his wage to match that of his female counterparts. (Compl. ¶ 22).

Before August 1, 2013, Hinton had never been reprimanded or disciplined for talking about sex with co-workers, lending money to or borrowing money from coworkers, talking about "University business, such as the transfers of fellow employees or the salary information of VUU employees," or "generally talking about personal matters with fellow VUU employees." (Compl. ¶ 12).

However, on or about August 1, 2013, Dr. Latrelle Green ("Green") became Interim Dean of the School of Mathematics, Science, and Technology, a move that also made her Hinton's direct supervisor. (Compl. ¶ 10). Green was "aware of Hinton's past outspoken support for his own civil rights and the rights of others. She was also aware of Hinton's prior EEOC charge." (Compl. ¶ 11). On August 6, 2013, Green "verbally counseled" Hinton to stop engaging in "petty gossip." (Compl. ¶ 13). On August 29, 2013, Green "told [Hinton] that he had already been warned to stop engaging in 'drama and recurring gossip' and told him to cease." (Compl. ¶ 14). On September 6, 2013, Green "wrote Hinton a letter in which she detailed many instances of alleged 'unprofessional misconduct.'" (Compl. ¶ 15). "The letter served as a written reprimand and was placed in Hinton's personnel file." (Compl. ¶ 15). Hinton's Complaint states that he engaged

3

in no unprofessional conduct, and that "most of the items identified ... are false or grossly exaggerated." (Compl. ¶ 16). At some unspecified point after September 6, 2013, Green refused to let Hinton take classes at Virginia Commonwealth University ("VCU") (Compl. ¶ 19), notwithstanding that other VUU employees had been allowed to take classes at VCU for some time. (Compl. ¶ ¶ 34). Hinton characterizes this refusal as "retaliation." (Compl. ¶ 19).

Hinton filed a second EEOC charge at in 2013, but the Complaint does not state when the 2013 charge was filed. VUU states that the 2013 EEOC charge was filed on September 10, 2013, in response to Dr. Green's reprimands. (Def.'s Mem 10; Docket No. 4, Ex. C).[1]

At some unspecified point before August 2015, Green ceased to be Hinton's supervisor. Hinton's subsequent supervisor gave Hinton permission to take classes at VCU. (Compl. ¶ 19).

In August 2015 (after Green ceased to be Hinton's supervisor), Green "candidly admitted to Hinton that one of the reasons she gave Hinton the September 6, 2013 reprimand letter" was that Dr. Claude Perkins ("Perkins"), the President of VUU,

---

[1] Hinton does not contest that the Court may consider the text of Hinton's September EEOC charge even though that document was not part of the Complaint. See also Atkins v. FedEx Freight, Inc. No. 3:14CV505, 2015 WL 34444870, *3, n.4 (E.D. Va. May 28, 2015).

4

"told her to do so because he had a problem with Hinton's sexual orientation." (Compl. ¶ 18).

On these facts, Hinton presents four counts against VUU. Count I alleges Title VII discrimination on the basis that: (1) Hinton is entitled to Title VII's protection against sex discrimination; (2) Hinton was reprimanded in August and September 2013 because Perkins (VUU's president) did not like his sexual orientation; and (3) as a direct result of that reprimand, Hinton suffered a "loss of potential occupational opportunities" and various emotional harms. (Compl. ¶¶ 26-29). Count II alleges Title VII retaliation on the basis that: (1) Hinton engaged in protected activities in 2008 and 2013; (2) VUU retaliated against Hinton by disciplining him in August and September 2013 ("based on false allegations and in a manner that was disparate to other VUU employees") and refusing to allow him to take VCU classes; and (3) as a direct result of that retaliation, Hinton suffered a "loss of potential occupational opportunities" and various emotional harms. (Compl. ¶¶ 33-36). Count III alleges Title VII retaliatory harassment, on the basis that: (1) Hinton engaged in protected activities in 2008 and 2013; (2) VUU retaliated against Hinton by disciplining him in August and September 2013 ("based on false allegations and in a manner that was disparate to other VUU employees") and refusing to allow him to take VCU classes; and (3) as a direct result of

5

that retaliatory harassment, Hinton suffered a "loss of potential occupational opportunities" and various emotional harms. (Compl. ¶¶ 39-41).[2] Count IV alleges that Hinton, a male, was paid less than his comparable female counterparts.

VUU filed this Motion to Dismiss (Docket No. 3) along with a Memorandum of Law in Support (Docket No. 4) ("Def.'s Mem."). VUU seeks to dismiss all four counts pursuant to Fed. R. Civ. P. 12(b)(6) (failure to state a claim) and Fed. R. Civ. P. 12(b)(4) (insufficient process). Plaintiff filed a Memorandum in Opposition (Docket No. 7) ("Pl.'s Opp."), and Defendant filed a Reply (Docket No. 9) ("Def.'s Reply").

## DISCUSSION

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of a complaint. Jordan v. Alternative Resources Corp., 458 F.3d 332, 338 (4th Cir. 2006). Fed. R. Civ. P. 8(a)(2) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (citing Bell Atl. Corp. v.

---

[2] The facts underlying Counts II and III are identical, except that Hinton characterizes Green's actions as "retaliation" in Count Two and "retaliatory harassment" in Count Three.

6

Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

When deciding a motion to dismiss under Rule 12(b)(6), a court "draw[s] all reasonable inferences in favor of the plaintiff." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009). However, while the court must "will accept the pleader's description of what happened" and "any conclusions that can be reasonably drawn therefrom," the court "need not accept conclusory allegations encompassing the legal effects of the pleaded facts," **Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure** § 1357 (3d ed.1998); Chamblee v. Old Dominion Sec. Co., L.L.C., No. 3:13CV820, 2014 WL 1415095, *4 (E.D. Va. 2014). Nor is the court required to accept as true a legal conclusion unsupported by factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "Twombly and Iqbal also made clear that the analytical approach for evaluating Rule 12(b)(6) motions to dismiss requires courts to reject conclusory allegations that amount to mere formulaic recitation of the elements of a claim and to conduct a context-specific analysis to determine whether the well-pleaded factual allegations plausibly suggest an entitlement to relief." **Wright & Miller,** supra; Chamblee, supra. In sum, a 12(b)(6) motion should be granted if, "after accepting all well-pleaded allegations ... as

7

true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).

These principles govern resolution of VUU's motion. Each count will be considered in turn.

## A.    Count I: Title VII Discrimination

VUU's motion will be granted as it pertains to Count I because Title VII does not afford a claim for sexual orientation discrimination and thus Hinton does not belong to a protected class. In the alternative, Hinton does not plead that VUU took a cognizable "adverse employment action" against him." Count I will be dismissed.

### 1.    Title VII Does Not State a Claim for Sexual Orientation Discrimination

VUU seeks dismissal of Count I because Title VII affords no predicate for a claim of discrimination on account of sexual orientation.

Title VII prohibits discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-(2)(a)(1). It is explicitly the law of the Fourth Circuit that

8

Title VII does not protect against discrimination based on sexual orientation. Murray v. N. Carolina Dep't of Pub. Safety, 611 F. App'x 166 (4th Cir. 2015) (relying on Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 143 (4th Cir. 1996); see also, e.g., Lewis v. High Point Reg'l Health Sys., 79 F. Supp. 3d 588, 589 (E.D.N.C. 2015) (same); Henderson v. Labor Finders of Virginia, Inc., No. 3:12CV600, 2013 WL 1352158, at *4 (E.D. Va. Apr. 2, 2013) (same).

Hinton attacks the law of the circuit on two grounds: first, that Wrightson has no precedential value, and second that Wrightson has been essentially superseded by a 2015 EEOC decision. (Pl.'s Mem. 5-11).

### (a)  Wrightson Applies In This District

Hinton challenges the precedential value of Wrightson in an attempt to dislodge the cases that have restated or relied upon Wrightson. According to Hinton, the text in Wrightson stating that "Title VII does not afford a cause of action for discrimination based upon sexual orientation" is dicta because the case actually turned on issues of same-sex sexual harassment. (Pl.'s Mem. 5).[3]

---

[3] Hinton also stresses that Wrightson's holding on same-sex discrimination was overruled by the Supreme Court in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). Because Oncale did not touch Wrightson's rule that Title VII does not protect against discrimination based on sexual orientation, it is not accurate

9

Although Wrightson's rule began its life as dicta, the rule has subsequently been incorporated in a substantive manner into the holdings of several district courts within the Fourth Circuit, this Court included. Henderson, 2013 WL 1352158, at *4; see also Dawkins v. Richmond Cty. Sch., No. 1:12CV414, 2012 WL 1580455, at *4 (M.D.N.C. May 4, 2012); Dudley v. 4-McCar-T, Inc., No. 7:09-CV-00520, 2011 WL 1742184, at *4 (W.D. Va. May 4, 2011) aff'd, 458 F. App'x 235 (4th Cir. 2011); Fenner v. Durham Cty. Det. Ctr., No. 1:10CV369, 2010 WL 4537850, at *2 (M.D.N.C. Nov. 3, 2010); Wamsley v. Lab Corp., No. CIV.A. 1:07CV43, 2007 WL 2819632, at *1 (N.D. W. Va. Sept. 26, 2007).

Wrightson has also been noted or relied upon by other federal circuit courts in formulating holdings that subscribe to Wrightson's dicta. In Simonton, relying in part on Wrightson, the Second Circuit upheld the dismissal of a sexual orientation discrimination claim under Rule 12(b)(6), holding that "[b]ecause the term 'sex' in Title VII refers only to membership in a class delineated by gender, and not to sexual affiliation, Title VII does not proscribe discrimination because of sexual orientation." Simonton v. Runyon, 232 F.3d 33, 36 (2d Cir. 2000) (citing DeCinto v. Westchester County Med. Ctr., 807 F.2d 304, 306-07 (2d Cir. 1986). Citing Simonton and Wrightson, the Tenth

to say that the Supreme Court overruled the portion of Wrightson which is relevant here.

Circuit followed suit in Medina v. Income Support Div., New Mexico, 413 F.3d 1131, 1135 (10th Cir. 2005). Those decisions reflect accurately the text and reach of Title VII. They also reflect the law in this district that Title VII provides no claim for discrimination on account of sexual orientation.

### (b) The EEOC Has Not Displaced Wrightson

Hinton also argues that, even if Wrightson is settled law, Wrightson was displaced by a July 2015 EEOC ruling that Title VII protects against discrimination based on sexual orientation. (Pl.'s Opp. 7-11) (relying on Baldwin v. Foxx, EEOC DOC 0120133080, 2015 WL 4397641, at *1 (July 16, 2015)).

EEOC interpretations of Title VII are entitled to Skidmore deference at most - that is, "deference to the extent [that they have] the power to persuade." Vill. of Freeport v. Barrella, No. 14-2270-CV, 2016 WL 611877, at *11 (2d Cir. Feb. 16, 2016) (relying on Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 53 (2d Cir. 2012); Univ. of Tex. Sw. Med. Ctr. v. Nassar, -- U.S. - --, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013)); Crump v. TCoombs & Associates, LLC, No. CIV.A. 2:13CV707, 2015 WL 5601885, at *24 n.12 (E.D. Va. Sept. 22, 2015) (EEOC guidance given deference only to the extent that it has power to persuade). The district courts that have decided Title VII claims in the wake of Foxx have also given the EEOC's interpretation of Title VII deference to the extent that the

11

EEOC's decision is persuasive. E.g., Christiansen v. Omnicom Grp., Inc., No. 15 CIV. 3440 (KPF), 2016 WL 951581, at *15 (S.D.N.Y. Mar. 9, 2016); Videckis v. Pepperdine Univ., No. CV1500298DDPJCX, 2015 WL 8916764, at *8 (C.D. Cal. Dec. 15, 2015); Isaacs v. Felder Servs., LLC, No. 2:13CV693-MHT, 2015 WL 6560655, at *3-4 (M.D. Ala. Oct. 29, 2015); Dew v. Edmunds, No. 1:15-CV-00149-CWD, 2015 WL 5886184, at *9 (D. Idaho Oct. 8, 2015); Burrows v. Coll. of Cent. Florida, No. 5:14-CV-197-OC-30PRL, 2015 WL 5257135, at *2 (M.D. Fla. Sept. 9, 2015).

District courts have, however, split on whether to follow the EEOC or to follow the law of their regional circuits and their own districts. Christiansen and Burrows noted that the EEOC's decision was entitled to deference to the extent that it was persuasive, but found that the decision could not displace the explicit holdings of their regional circuit court (in the case of Christiansen) or of their own district (in the case of Burrows). Christiansen, 2016 WL 951581, at *15; Burrows, 2015 WL 5257135, at *2. As the Christiansen court noted: (1) the conduct before it was "reprehensible"; (2) "[t]he broader legal landscape has undergone significant changes" toward increased protection against sexual orientation discrimination in recent

12

years;[4] and (3) current rules recognizing Title VII discrimination claims based on sexual stereotyping but barring claims based on sexual orientation discrimination[5] are incoherent. Christiansen, 2016 WL 951581, at *13-15. However, that court still concluded that that, under binding Second Circuit precedent,[6] it could not adopt the EEOC's position.

By contrast, Isaacs and Videckis adopted the EEOC's position without addressing governing precedent from the regional circuit or their own district. Isaacs, 2015 WL 6560655, at *3-4; Videckis, 2015 WL 8916764, at *8. The Eastern District of New York adopted the EEOC's position, notwithstanding explicit Second Circuit law to the contrary. Roberts v. United Parcel Serv., Inc., 115 F. Supp. 3d 344 (E.D.N.Y. 2015) (surveying the federal and local sea-change in attitudes towards

---

[4] Pointing particularly to United States v. Windsor, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013) and Obergefell v. Hodges, 135 S. Ct. 2584, 192 L. Ed. 2d 609 (2015).

[5] The Second Circuit imposed such a rule in Simonton, 232 F.3d at 33. The Fourth Circuit has never explicitly embraced such a juxtaposition, though it has held that sexual discrimination is non-actionable, Wrightson, while leaving open the possibility that sexual stereotyping is actionable. M.D. v. Sch. Bd. of City of Richmond, 560 F. App'x 199, 203 (4th Cir. 2014). This Court also employed such a distinction in Henderson, 2013 WL 1352158, at *4.

[6] Simonton, 232 F.3d at 33-25.

sexual orientation discrimination).[7] For that reason, Roberts is of no effect, because a district court simply cannot change the law of the regional circuit.

Finally, the Fourth Circuit cited Wrightson's rule approvingly even after the EEOC decision. Murray v. N. Carolina Dep't of Pub. Safety, 611 F. App'x 166 (4th Cir. 2015). However, Murray (1) is unpublished, (2) cites Wrightson in dicta, (3) is a brief per curiam opinion with no legal analysis of its own; and (4) shows no sign that the Fourth Circuit was even aware of the EEOC decision in Foxx when it issued Murray. Nonetheless, at the margins, Murray makes clear that Wrightson is still considered to be the basis for decision in the jurisprudence of the Fourth Circuit and by district courts in this circuit.

More importantly, the reasons offered in decisions that have adopted the EEOC's position are matters that lie within the purview of the legislature, not the judiciary. Title VII is a creation of Congress and, if Congress is so inclined, it can either amend Title VII to provide a claim for sexual orientation discrimination or leave Title VII as presently written. It is not the province of unelected jurists to effect such an amendment.

---

[7] The remaining case dealing with the EEOC decision, Dew, is complicated by immunity questions. Dew, 2015 WL 5886184, at *9.

14

In sum, Title VII does not encompass sexual orientation discrimination claims, and cannot be supplanted by the merely-persuasive power of the EEOC's decision. For the foregoing reasons, Hinton does not state a claim for discrimination under Title VII and Count I will be dismissed.

### 2.   Alternatively, Count I Fails to Adequately Plead an Adverse Employment Action

Ordinarily, it is preferable to avoid alternative holdings. Karsten v. Kaiser Found. Health Plan of the Middle Atlantic States, Inc., 36 F.3d 8, 11 (4th Cir. 1994); Amato v. City of Richmond, 875 F. Supp. 1124, 1139 (E.D. Va. 1994), aff'd, 78 F.3d 578 (4th Cir. 1996). However, given the evolving state of the law and split district court decisions respecting whether sexual orientation discrimination claims are cognizable under Title VII, it is prudent also to consider VUU's argument that Hinton has not adequately pled the adverse employment action element of a Title VII discrimination claim.

### (a)   Preliminary Issue On Pleading Requirements

A plaintiff can prove Title VII unlawful discrimination in one of two ways: either with direct evidence or through the

"prima facie" method (also called "burden shifting" or the
McDonnell Douglas framework).[8]

First, in the "direct" method, a plaintiff can provide (1)
direct or indirect evidence of intentional discrimination (2)
against plaintiff for belonging to a protected class, which
motivated (3) an adverse employment action. E.g., Hill v.
Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th
Cir. 2004) abrogated on other grounds by Nassar, 133 S. Ct. at
2532; see also Foster v. Univ. of Maryland-E. Shore, 787 F.3d
243, 249 (4th Cir. 2015) (recognizing such abrogation). "Direct
evidence may include ... statements by an employee's supervisors
that are generally discriminatory or statements by supervisors
that indicate that their actions were motivated by the
employee's race or sex, or in retaliation against filed EEOC
claims .... Courts routinely consider indirect evidence to be
tantamount to circumstantial evidence." Lee v. Wade, No.
3:15CV37, 2015 WL 5147067, at *3 (E.D. Va. Aug. 31, 2015)
(adopting report and recommendation); see also Martin v. Scott &
Stringfellow, Inc., 643 F. Supp. 2d 770, 782 (E.D. Va.) aff'd,
352 F. App'x 778 (4th Cir. 2009).

Second, "in the absence of [direct] evidence, a plaintiff
may prove unlawful discrimination under the burden-shifting

---

[8] Most importantly for this case, under either method, Hinton
must establish both that (1) he belonged to a protected class
and (2) his employer took adverse employment action against him.

16

framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Lee, 2015 WL 5147067, at *3. "To establish a prima facie case of race discrimination under McDonnell Douglas, a plaintiff must demonstrate '(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" Goode v. Cent. Virginia Legal Aid Soc'y, Inc., 807 F.3d 619, 626 (4th Cir. 2015) (quoting Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd sub nom. Coleman v. Court of Appeals of Maryland, 132 S. Ct. 1327, 182 L. Ed. 2d 296 (2012)). Once a plaintiff makes the prima facie case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection," after which the plaintiff must "be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext." McDonnell Douglas, 411 U.S. at 802-04.[9]

In light of this, Hinton is not entirely correct in citing Coleman for the proposition that, in the employment context, "a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss." (Pl.'s Opp. 4) (quoting Coleman, 626 F.3d at 190). At the same time, VUU is

---

[9] Neither party has briefed on legitimate, non-discriminatory reasons. Instead, the parties' papers are firmly fixated on the elements of a prima facie claim.

17

not entirely correct in quoting Lee for the proposition that "the plaintiff must plead sufficient facts to allow the court to reasonably infer a prima facie case." (Def.'s Mem. 4). Instead, a plaintiff must plead facts that, when all reasonable inferences are drawn in the plaintiff's favor, e.g., Edwards, 178 F.3d at 244, would permit finding either that the plaintiff has pled a "direct" case or that plaintiff has made a prima facie case.

In this case, Hinton alleges that Green told him that "one of the reasons she gave Hinton the September 6, 2013 reprimand letter was that ... the President of VUU [] told her to do so because he had a problem with Hinton's sexual orientation." (Compl. ¶ 18). Assuming that there is a Title VII claim for sexual orientation discrimination (which, as discussed in the previous section, there is not) that is the sort of direct evidence that would require the court to analyze Hinton's complaint by the direct evidence method.

Even under the direct evidence method, Hinton must still plead facts that would allow the court, drawing all reasonable inferences in Hinton's favor, to conclude that Hinton adequately pled both that Hinton is a part of a protected class as a gay man, and also that VUU took adverse employment action against Hinton. Hill, 354 F.3d at 284; Edwards, 178 F.3d at 244. Aside from the issue of protected class, as discussed above, VUU

18

argues that the August and September reprimands do not constitute adverse employment action (Def.'s Mem. 5-9; Def.'s Reply 4-9), and thus that Hinton has not adequately pled a Title VII claim even if he were a member of a protected class. Accordingly, the Court next considers whether Hinton has stated facts which plausibly support the existence of an adverse employment action.

### (b) "Adverse Employment Action"

To be cognizable under Title VII's prohibition on workplace discrimination, the employer must engage in an "adverse employment action." E.g., Goode, 807 F.3d at 625. The August and September 2013 reprimands, absent allegations of collateral consequences, do not rise to the level of "adverse employment action," and cannot support a claim for discrimination under Title VII.

Title VII protects against adverse employment actions, not all workplace injustices. "The italicized words in [42 U.S.C. § 2000e-2(a)(1)] — 'hire,' 'discharge,' 'compensation, terms, conditions, or privileges of employment,' 'employment opportunities,' and 'status as an employee' — explicitly limit the scope of that provision to actions that affect employment or alter the conditions of the workplace." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62, 126 S. Ct. 2405, 2411-12, 165 L. Ed. 2d 345 (2006); see also Jeffers v. Thompson, 264 F. Supp.

19

2d 314, 329 (D. Md. 2003) (noting that discriminatory conduct must "materially alter the terms, conditions, or benefits of employment" resulting in "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion."). Thus, "[t]o prevail on a Title VII claim, 'the existence of some adverse employment action is required.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (internal quotations omitted). "An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" Id.

The United States Court of Appeals for the Fourth Circuit and its district courts have hewed to the view that neither oral nor written reprimands constitute the sort of adverse employment action cognizable under Title VII unless plaintiff also alleges that the reprimand has potential collateral consequences that rise to the level of an adverse employment action. In Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 429 (4th Cir. 2015) the Court of Appeals affirmed a grant of summary judgment for the reason that "neither the written nor the verbal reprimands qualify as adverse employment actions, because they did not lead to further discipline." In Prince-Garrison v. Maryland Dep't of Health & Mental Hygiene, 317 F. App'x 351, 353 (4th Cir. 2009), the Fourth Circuit affirmed a dismissal pursuant to Rule

12(b)(6) because "reprimands for insubordination, meetings with supervisors, and directions to attend counseling, do not constitute adverse employment actions."[10] In Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 755 (4th Cir. 1996), the Court of Appeals affirmed a grant of summary judgment for defendant where the plaintiff "received a formal disciplinary warning ... but the warning was subsequently removed from his personnel record." In Jeffers, the district court granted summary judgment because:

> [l]ike a reprimand, a poor performance rating does not in itself constitute an adverse employment action ... Rather, it is a mediate step, which, if relied upon for a true adverse employment action (e.g., discharge, demotion, etc.) becomes relevant evidence... HHS never used Ms. Jeffers' 'unacceptable' performance rating to her detriment. Moreover, like the reprimand she received, the negative evaluation remained in her official personnel file only two years; the file now contains no record of it... Accordingly, Ms. Jeffers' performance rating does not rise to the level of an adverse employment action.")

Jeffers, 264 F. Supp. at 330 (internal quotations omitted). In this district, the Court granted summary judgment for the employer where the employee received a reprimand, but there was

---

[10] Of the cases recited in this paragraph, only Prince-Garrison involved a motion to dismiss; the other cases were presented on summary judgment. Prince-Garrison is unreported, and is thus persuasive rather than binding. However, as discussed below, the general principles governing whether an employer's action constitutes is an "adverse employment action" tend to independently support a finding that a reprimand, without collateral consequences, does not rise to the level of an adverse employment action.

no "evidence in the record that he suffered any adverse effect on the terms, conditions, or benefits of his employment." Jackson v. Winter, 497 F. Supp. 2d 759, 771 (E.D. Va. 2007)

As VUU correctly points out, Hinton has not alleged that Green's reprimands ever led to an adverse employment action that affected the terms or conditions of his employment. Indeed, Hinton does not contend that the Complaint contains such an allegation.    Instead, he argues that the Complaint need not specifically allege that the reprimand led to adverse employment action.   For that contention, Hinton relies on Law v. Autozone Stores, Inc., No. CV 4:09CV17, 2009 WL 4349165 (W.D. Va. Nov. 25, 2009) and Koenig v. McHugh, 3:11cv60, 2012 WL 1021849 (W.D. Va. Mar. 26, 2012). Hinton also argues that most of VUU's cases involve summary judgment and thus are not controlling at this stage of the proceedings.     There are three major flaws with Hinton's reliance on these cases: (1) Koenig does not support Hinton's position; (2) Law is inapplicable after Iqbal; and (3) Prince-Garrison indicates that the distinction between a motion to dismiss and a motion for summary judgment should not alter the analysis that was the basis for the decision in Adams and similar cases.

### (i) Koenig Requires Allegations of Collateral Consequences

In Koenig, plaintiff's employer issued her a written reprimand (a "warning letter"). Koenig, 2012 WL 1021849, at *3. Koenig alleged that the letter "subjected [her] to more serious discipline than she would otherwise be subject to in the future in the event there were future charges of misconduct." Id.

> The defendant maintains that the letter of counseling issued to Koenig does not rise to the level of an adverse employment action for purposes of Title VII....
>
> [C]ourts have held that a written warning or letter of counseling may rise to the level of an adverse employment action "if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities." ... Given Koenig's assertion that the letter of counseling subjected her to more serious discipline than she would have otherwise faced if the letter had not been issued, the court is unable to conclude, at this stage of the litigation, that Koenig did not suffer an adverse employment action.

Koenig, 2012 WL 1021849, at *4-5 (denying motion to dismiss).

At most, Koenig states a refinement of the rule in Adams, et al.: a reprimand is not an adverse employment action unless plaintiff also pleads that such a reprimand will subject plaintiff to bona fide adverse employment actions in the future. However, this case is easily differentiated from Koenig because Hinton did not plead that the August and September 2013

23

reprimands would subject him to more serious adverse employment actions in the future.

Hinton urges that it is permissible generally to infer that any reprimand will result in a likelihood of more serious future discipline.  That, however, is inconsistent with settled Title VII jurisprudence that not every workplace wrong has a federal remedy. E.g., White, 548 U.S. at 62; Holland, 487 F.3d at 219. In light of White and Holland, it is inappropriate to conclude that every allegation of a reprimand permits an inference that the reprimand is the type of wrong covered by Title VII, without an accompanying specific allegation that, under the employer's disciplinary scheme or for some other plausible reason, the reprimand will subject plaintiff to adverse employment action if plaintiff is disciplined in the future. That is the clear teaching of Prince-Garrison, 317 F. App'x at 353, which upheld a motion to dismiss because plaintiff did not allege that the reprimand could serve as the basis for future, harsher adverse employment actions. Although Prince-Garrison, as an unpublished case, is of persuasive rather than binding effect, there is no reason to deviate from Prince-Garrison when the thrust of White and Holland clearly signals that courts should not treat the anti-discrimination provision of Title VII as giving a remedy for actions that do not materially alter the plaintiff's terms and conditions of plaintiff's employment.

24

Thus, the approach that is most consistent with circuit precedent is to conclude that, at the very least, a reprimand cannot satisfy the adverse employment action element of a Title VII discrimination claim unless the complaint specifically alleges that: (1) the reprimand has had a direct adverse employment effect or (2) the reprimand, under the employer's disciplinary practices or for some other plausible reason, will exacerbate future discipline in a way that plausibly can be expected to create a future adverse employment effect.

### (ii) Law v. Autozone Reflects Outdated Pleading Standards That Do Not Govern Here

Law states that merely alleging a reprimand, without alleging collateral consequences, is sufficient to establish an adverse employment action at the motion to dismiss stage. Law, 2009 WL 4349165, at *2.

> Defendant AutoZone cites a string of cases for the proposition that a written reprimand is insufficient as a matter of law to constitute an adverse employment action. This interpretation of the relevant case law is mistaken. The precedent clarifies that a reprimand is neither automatically sufficient nor per se insufficient to meet that element of the claim. See Prince-Garrison v. Md. Dep't of Health & Mental Hygiene, 317 Fed. Appx. 351, 353 (4th Cir. 2009). Instead, each case cited by AutoZone indicates that the relevant inquiry is whether the reprimand had tangible, adverse effects on the plaintiff's employment. See id. (upholding the district court's finding that plaintiff did not show disciplinary measures had a "tangible effect[ ] on

25

employment) ... <u>Amirmokri v. Abraham</u>, 437 F. Supp. 2d 414, 423 (D. Md. 2006), <u>aff'd</u>, 266 Fed. Appx. 274 (4th Cir. 2008) (inquiring whether plaintiff's reprimand "affected the terms and conditions of his employment, his opportunities for advancement, or any other aspect of his career") ... <u>Jeffers v. Thompson</u>, 264 F.Supp.2d 314, 330 (D.Md.2003) ("[I]f evidence shows that a reprimand not only bruises an employee's ego or reputation, but also works a real, rather than speculative, employment injury, the reprimand becomes an adverse employment action." (citations omitted)) ... Thus, AutoZone's argument that a reprimand is automatically insufficient as a matter of law is without merit.

Plaintiff's Complaint does not describe the effect of a written reprimand on employee pay, advancement opportunities, or dismissal. <u>Given the fact that a court should construe the allegations of the Complaint in a light most favorable to the plaintiff, Matkari, 7 F.3d at 1134, Ms. Law's complaint does not demonstrate the sort of "insuperable bar to relief" necessary to require dismissal</u> of this claim, <u>Browning</u>, 945 F.Supp. at 931 (internal quotation omitted). Should additional evidence reveal that AutoZone's written reprimands lack the sort of effect necessary to qualify as adverse employment actions, summary judgment in AutoZone's favor may be appropriate.

<u>Law</u>, 2009 WL 4349165, at *2 (some district court citations omitted) (emphasis added). Hinton's reliance on <u>Law</u> is unpersuasive for two reasons.

First, <u>Law</u> does not actually state that a reprimand, without allegations of accompanying material change, is sufficient to state a claim for Title VII discrimination.

26

Rather, Law requires "inquiry [into] whether the reprimand had tangible, adverse effects on the plaintiff's employment." Law, 2009 WL 4349165, at *2. Like Koenig, Law recognizes that an adverse employment action must be associated with the reprimand to obtain relief under Title VII. Rather than disagreeing on the elements of a prima facie Title VII discrimination claim, Law denied the motion to dismiss on the grounds that plaintiff was not required to specifically allege, in the complaint, the collateral consequences thought to constitute adverse employment action.

This leads into the second problem with reliance on Law: Law's position that the plaintiff need not allege collateral consequences constituting adverse employment action in the complaint has been upended by the thrust of post-Iqbal jurisprudence, and also runs counter to Prince-Garrison.

Law was decided several months after Iqbal and actually cites Iqbal; however, the decision reflects pre-Iqbal sensibilities that the Fourth Circuit has noted no longer govern federal pleading standards. Specifically, Law takes its pleading standards from Browning v. Vecellio & Grogan, Inc., 945 F. Supp. 930, 931 (W.D. Va. 1996), which noted that dismissal is limited to "the extraordinary case where the pleader makes allegations that show on the face of the complaint some insuperable bar to relief." Law, 2009 WL 4349165, at *1. It appears that no court

has explicitly found that Iqbal abrogated the "insuperable bar" formulation.[11] However, as VUU notes, the "insuperable bar" language runs contrary to the thrust of Twombly and Iqbal, (Def.'s Reply 8), as recognized in broad terms by the Fourth Circuit. As the Fourth Circuit explained in Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009):

> In recent years, with the recognized problems created by [suits making largely groundless claims to justify conducting

---

[11] The "insuperable bar" standard for dismissal seems to make its first appearance in a federal appeals court opinion in Corsican Prods. v. Pitchess, 338 F.2d 441, 443 (9th Cir. 1964) (quoting Wright, **Federal Courts** 250 (1963)), though the phrase became considerably more popular in the 1970s after several federal circuit courts plucked it from the second edition of Wright's treatise. E.g., Lewis v. Chrysler Motors Corp., 456 F.2d 605, 607 (8th Cir. 1972).

The phrase has never been adopted in the Eastern District of Virginia; the exception that proves the rule is Ciralsky v. C.I.A., No. 1:10CV911 LMB/JFA, 2010 WL 4724279, at *6 (E.D. Va. Nov. 15, 2010) aff'd sub nom. Ciralsky v. Tenet, 459 F. App'x 262 (4th Cir. 2011), which noted the Third Circuit's use of the phrase. The Fourth Circuit used the phrase once: in the context of an opinion about summary judgment that was later vacated (on substantive grounds, rather than pleading standards) after a rehearing en banc. Boring v. Buncombe Cty. Bd. of Educ., 98 F.3d 1474, 1479 (4th Cir. 1996), reh'g en banc granted, opinion vacated, on reh'g en banc, 136 F.3d 364 (4th Cir. 1998). The phrase was common in Western District of Virginia opinions until several months after Iqbal, at which point it completely disappeared from usage in the Western District of Virginia; Law is actually the last Western District of Virginia case that used the language. The single post-Law use of the phrase in this circuit is Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC, 976 F. Supp. 2d 706, 713 (M.D.N.C. 2013).

Thus, although the "insuperable bar" language has not been explicitly disavowed, the term's near-disappearance within the Fourth Circuit several months after Iqbal tends to indicate that the phrase was displaced by the Twombly-Iqbal shift.

extensive and costly discovery with the hope
of forcing the defendant to settle at a
premium to avoid the costs of the discovery]
see 5A Wright & Miller, **Federal Practice and
Procedure**, § 1296, at 46 & n. 9, and the
high costs of frivolous litigation, the
Supreme Court has brought to the forefront
the Federal Rules' requirements that permit
courts to evaluate complaints early in the
process. Thus, in Iqbal, the Court stated
that "[t]o survive a motion to dismiss, a
complaint must contain sufficient factual
matter, accepted as true, to 'state a claim
to relief that is plausible on its face.' "
129 S.Ct. at 1949 (emphasis added) (quoting
Twombly, 550 U.S. at 570, 127 S.Ct. 1955).
The plausibility standard requires a
plaintiff to demonstrate more than "a sheer
possibility that a defendant has acted
unlawfully." Id. It requires the plaintiff
to articulate facts, when accepted as true,
that "show" that the plaintiff has stated a
claim entitling him to relief, i.e., the
"plausibility of 'entitlement to relief.' "
Id. (quoting Twombly, 550 U.S. at 557, 127
S.Ct. 1955).

Put another way, the standard of Browning and Law required the

plaintiff to plead a case for which relief is not impossible.

The proper standard Twombly and Iqbal requires the plaintiff to

plead facts which make relief plausible, a tighter requirement

than "not impossible." Thus, Law does not help Hinton's

argument.

### (iii)   Prince-Garrison Teaches That Failure to Allege More Than a Reprimand-Without-Collateral-Consequences Requires Dismissal

Finally, Hinton argues that:

as an overall fundamental flaw, VUU seeks
dismissal by improperly substituting summary

29

> judgment standards for basic "notice
> pleading" standards. Relying, for example,
> almost exclusively on "prima facie case"
> evidentiary standards and decisions from the
> summary judgment context, VUU argues that
> Hinton's allegations are insufficient to
> state claims because ... he has not suffered
> an adverse employment action or a materially
> adverse employment action for purposes of
> his Title VII discrimination and retaliation
> claims.

(Pl.'s Opp. 2). It is true that most of the decisions on which

VUU relies arose in the context of summary judgment. However,

Hinton's position is untenable in light of Prince-Garrison,

which granted a motion to dismiss for failure to allege the

types of material harms required to satisfy the adverse

employment action element of a Title VII discrimination claim.

> [F]ailure to provide [plaintiff] with office
> supplies, reprimands for insubordination,
> meetings with supervisors, and directions to
> attend counseling, do not constitute adverse
> employment actions. See Thompson v. Potomac
> Elec. Power Co., 312 F.3d 645, 651-52 (4th
> Cir. 2002) (finding that neither
> 'disciplinary discussion' prompted by
> employee's insubordination nor performance
> evaluation unaccompanied by tangible effects
> on employment were adverse employment
> actions for purposes of a retaliation claim
> under Title VII)").

Prince-Garrison, 317 F. App'x at 351. As an unpublished case,

Prince-Garrison is persuasive rather than binding, but its

holding is consistent with (1) Adams's holding on the elements

of a Title VII discrimination claim and (2) Francis's

recognition of Iqbal's impact on pleading standards. Thus, it is

30

irrelevant that the issue arises on a motion to dismiss rather than on a motion for summary judgment. Absence of sufficient allegations in the Complaint is fatal at the Rule 12(b)(6) stage, just as absence of proof supporting such an allegation is fatal at the Rule 56 stage. In this case, Hinton failed to allege facts upon which the Court can plausibly infer that an adverse employment action occurred, and has accordingly failed to state a claim for relief.

### (c) Application

Applying the distinction between Browning/Law and Francis to this case, it is clear that, in a post-Iqbal world, it is not enough for Hinton to plead that he received a reprimand, leaving it "not impossible" that the reprimand carried with it "tangible, adverse effect on employment" or the potential for such effects in conjunction with a subsequent disciplinary proceeding. Instead, his Complaint must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief." Francis, 588 F.3d at 193. Because Hinton did not plead that the August and September 2013 reprimands subjected him to present or potential future adverse employment actions,[12] he has failed to plead an injury cognizable

---

[12] Hinton's statement that "Hinton has been caused to suffer the loss of potential occupational opportunities" (Compl. ¶ 29) (1) is not an allegation that the terms of his employment were altered, as required by the adverse employment action element,

under Title VII.[13] Therefore, for that alternative reason, VUU's motion to dismiss will be granted as it pertains to Count I.

## B. Count II: Title VII Retaliation

For the reasons stated below, the motion to dismiss Count II will be granted as it pertains to: (1) the August and September 2013 reprimands; and (2) the refusal to allow class-taking as retaliation for the September 2013 EEOC complaint. However, the motion to dismiss Count II will be denied as it pertains to the refusal to allow class-taking as retaliation for the 2008 EEOC activity and the May 2013 internal complaint.

As with discrimination claims, retaliation claims may proceed under the direct method or under the prima facie method. Foster, 787 F.3d at 250; Lee, 2015 WL 5147067, at *4. Unlike Count I, where Hinton presented a direct statement by Green that he received a reprimand because of his sexual orientation, Hinton has offered none of the direct evidence that would allow him to proceed under the direct method. E.g., Lee, 2015 WL

---

and (2) is, in the absence of even general facts about the type of opportunities Hinton might have allegedly lost, a quintessential conclusory allegation.

[13] Most often a potential future adverse employment action will be one that is provided for in the employer's disciplinary scheme or practices or that is foreshadowed by specific statements or conduct accompanying the reprimand. That is because, without an allegation of that sort, an allegation of potential future action would be speculation or conjectural and thus would run afoul of the Twombly-Iqbal requirements.

5147067, at *3 (noting that direct evidence includes "statements by an employee's supervisors that are generally discriminatory or statements by supervisors that indicate that their actions were motivated by the employee's race or sex, or in retaliation against filed EEOC claims").[14]

In the absence of direct evidence, Hinton must proceed under the prima facie method. As to the first element, Hinton pled that he engaged in protected activity twice in 2008 (Compl. ¶¶ 7-9) and twice in 2013. (Compl. ¶¶ 20-22, 33). The parties dispute the second and third elements: whether Hinton was subjected to adverse employment action when Green reprimanded Hinton and refused to allow Hinton to take VCU classes (Compl. ¶

---

[14] In Lee, the magistrate judge's report noted that:

> Proceeding via allegations of direct or indirect evidence, a plaintiff must allege facts showing that unlawful retaliation was the "but-for" cause of the adverse employment action. … In the instant case, [plaintiff] has not alleged any direct or indirect facts in support of his retaliation claim, let alone any facts supporting a reasonable inference that unlawful retaliation was the "but-for" cause for [defendant] denying [plaintiff] promotions in 2013. Therefore, Lee's retaliation claim fails under this method of analysis.

Lee, 2015 WL 5147067, at *5. As in Lee, Hinton is unable to proceed under the direct route.

34), and whether Hinton has pled facts that make a causal link plausible.[15]

At the outset, it is important to note that the adversity element for a Title VII retaliation claim is somewhat different than for a Title VII discrimination claim. That difference is important here, but neither party has analyzed the requested dismissal of Count II in perspective of the difference. Thus, it is necessary to sort out the decisional law that controls the analysis of the adversity element in a retaliation claim from the decisional law that controls the adversity element in a retaliation claim.

### 1. The Controlling Standard For Retaliation Claims Is "Materially Adverse Action," Not "Adverse Employment Action

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees ... because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title

---

[15] The Court notes briefly that the nature of the discrimination that led to an employee's protected action is irrelevant to the employee's statement of a claim for retaliation. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69, 126 S. Ct. 2405, 2416, 165 L. Ed. 2d 345 (2006) ("this standard does not require a reviewing court or jury to consider 'the nature of the discrimination that led to the filing of the charge' .... Rather, the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint.") (internal citations omitted).

VII]." 42 U.S.C. § 2000e-3(a). VUU relies on the decision in Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd sub nom. Coleman v. Court of Appeals of Maryland, 132 S. Ct. 1327, 182 L. Ed. 2d 296 (2012) to articulate the elements of a prima facie retaliation claim. (Def.'s Mem. 12-13; Def.'s Reply 13). As stated in Coleman, "[t]he elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." However, Coleman misstates the second element of a prima facie retaliation claim. The Supreme Court, other Fourth Circuit opinions, and the opinions of other circuit courts clearly indicate that a "materially adverse action," not "adverse employment action," is the proper articulation of the adversity element in retaliation claims.

In 2006, the Supreme Court issued White, an opinion focused on distinguishing the standards for Title VII discrimination claims and Title VII retaliation claims. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). The Court began by discussing the intent and scope of the discrimination and retaliation provisions of Title VII. In so doing, the Court explained that Title VII seeks to encourage reporting, and therefore permits retaliation suits based on a broader class of employer actions than Title VII

35

permits in discrimination suits. As the Court held, "Title VII's substantive provision and its antiretaliation provision are not coterminous .... We ... reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actionable retaliation to so-called 'ultimate employment decisions.'" White, 548 U.S. at 67.

Having concluded that the "adverse employment action" standard for discrimination suits should not be used in retaliation suits, the Supreme Court proceeded to articulate an appropriate standard for actionable misconduct in Title VII retaliation cases.

> [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"...
>
> We speak of material adversity because we believe it is important to separate significant from trivial harms .... The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms .... It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers.... And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence .... We refer to reactions of a reasonable employee

36

> because we believe that the provision's
> standard for judging harm must be objective.

Id. at 68-69 (internal citations omitted) (emphasis added). This "materially adverse action" standard is explicitly less restrictive than the "adverse employment action" standard for discrimination claims. Id. at 62.[16]

Additionally, although "adverse employment actions" in the discrimination context must "affect employment or alter the conditions of the workplace," a "materially adverse action" in the retaliation context need not impact conditions in the workplace to be actionable. Indeed, White explicitly rejected the EEOC's understanding that the retaliation provision of Title VII required employment-related action. Id. at 64-67. Instead, the Court announced that "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67. "An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." Id. at 63.[17] Under White, effect on terms

---

[16] "The italicized words in [42 U.S.C. § 2000e-2(a)(1)] — 'hire,' 'discharge,' 'compensation, terms, conditions, or privileges of employment,' 'employment opportunities," and 'status as an employee' — explicitly limit the scope of [the anti-discrimination provision] to actions that affect employment or alter the conditions of the workplace." Id.

[17] In White, the Court noted two potential examples of retaliation that did not affect the terms of employment. First,

37

or conditions of employment can certainly be a factor in the
fact-based determination of material adversity, e.g., id. at 69
(discussing denial of training lunches); however, effect on
terms or conditions of employment is no longer necessary to
state actionable misconduct in a retaliation claim. Id. at 63-
67.

Shortly after the 2006 decision in White, several Fourth
Circuit cases applied the new "materially adverse action"
standard, noting that, after White, retaliation claims did not
require an adverse effect on terms of employment.

> [T]he district court held, relying on older
> Title VII cases ... that in order to
> establish an FLSA retaliation claim, Darveau
> had to demonstrate that he suffered a
> materially adverse employment action
> involving an ultimate employment decision
> related to hiring, leave, discharge,
> promotion, or compensation....
>
> This rationale rests on outdated Title VII
> precedent .... [I]n Burlington N. & Santa
> Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct.
> 2405, 2414, 165 L.Ed.2d 345 (2006), the
> Court held that a Title VII retaliation
> plaintiff need not allege or prove an
> ultimate adverse employment action, because
> "[t]he scope of the anti-retaliation
> provision extends beyond workplace-related

the Federal Bureau of Investigation took a "materially adverse
action" when it refused "contrary to policy[] to investigate
death threats against a federal prisoner made against [the
agent] and his wife." Id. at 63-64. Second, the Court, while
noting that "material adversity" was context-dependent, noted
that "A schedule change in an employee's work schedule may make
little difference to many workers, but may matter enormously to
a young mother with school-age children." Id. at 69.

38

> or employment-related retaliatory acts and
> harm." The Court ruled that Title VII's
> retaliation provision requires a plaintiff
> simply to allege and prove "that a
> reasonable employee would have found the
> challenged action materially adverse, which
> in this context means it well might have
> dissuaded a reasonable worker from making or
> supporting a charge of discrimination." Id.
> at 2415 (citations and internal quotation
> marks omitted).

Darveau v. Detecon, Inc., 515 F.3d 334, 341-42 (4th Cir. 2008);[18]

see also Caldwell v. Johnson, 289 F. App'x 579, 588 (4th Cir. 2008); Scurlock-Ferguson v. City of Durham, 221 F. App'x 292, 293 (4th Cir. 2007).

In the years since Darveau, Caldwell, and Scurlock-Ferguson, several Fourth Circuit opinions have followed suit and held that "material adverse action" is the required articulation of the adversity element in a retaliation claim. E.g. Mascone v. Am. Physical Soc'y, Inc., 404 F. App'x 762, 765 (4th Cir. 2010) ("In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took a materially adverse action against her; and (3) there is a causal connection between the

---

[18] Although Darveau was an FLSA retaliation case, the Fourth Circuit looked to the law of Title VII retaliation – particularly the new Title VII retaliation developments in White – to resolve the FLSA retaliation claim. Darveau, 515 F.3d at 342 (noting the "almost uniform practice of courts in considering the authoritative body of Title VII case law when interpreting the comparable provisions of other federal statutes.")

protected activity and the adverse action") (combining the old elements of King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) with the "materially adverse" rule of White); Pueschel v. Peters, 340 F. App'x 858, 861 (4th Cir. 2009) (same); see also Harrison v. S. Carolina Dep't of Mental Health, No. 14-2096, 2015 WL 4081226, at *4 (4th Cir. July 7, 2015) (unpublished) (noting that "material adversity" governs); Jensen-Graf v. Chesapeake Employers' Ins. Co., 616 F. App'x 596, 598 (4th Cir. 2015) (same); Buckley v. Mukasey, 538 F.3d 306, 315 (4th Cir. 2008) (same).

Other Courts of Appeals have likewise recognized the White shift. As a representative example, the Eleventh Circuit observed that:

> the Supreme Court's decision in Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ... announced a new rule which redefines the standard for retaliation claims under Title VII.
>
> Under the holding of Burlington, the type of employer conduct considered actionable has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related. See Burlington, 126 S.Ct. at 2415. Thus, the Burlington Court effectively rejected the standards applied by this court ... that required an employee to show either an ultimate employment decision or substantial employment action to establish an adverse

> employment action for the purpose of a Title
> VII retaliation claim ....
>
> This more liberal view of what constitutes
> an adverse employment action accords an
> employee protection from a wider range of
> retaliatory conduct than would be available
> under [previous standards].

Crawford v. Carroll, 529 F.3d 961, 973-74 (11th Cir. 2008)
(noting that the new standard is "decidedly more relaxed")
(emphasis added).  See also Carmona-Rivera v. Puerto Rico, 464
F.3d 14, 20 (1st Cir. 2006); Kessler v. Westchester Cty. Dep't
of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006); Moore v. City
of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006), as amended
(Sept. 13, 2006); Kebiro v. Walmart, 193 F. App'x 365, 369 n.2
(5th Cir. 2006); Laster v. City of Kalamazoo, 746 F.3d 714, 730
(6th Cir. 2014); Thomas v. Potter, 202 F. App'x 118, 119 (7th
Cir. 2006); Higgins v. Gonzales, 481 F.3d 578, 589 (8th Cir.
2007) abrogated on other grounds by Torgerson v. City of
Rochester, 643 F.3d 1031 (8th Cir. 2011); Dilettoso v. Potter,
243 F. App'x 269, 273 (9th Cir. 2007); Somoza v. Univ. of
Denver, 513 F.3d 1206, 1212 (10th Cir. 2008); Velikonja v.
Gonzales, 466 F.3d 122, 124 (D.C. Cir. 2006).

In sum, (1) the text of White, (2) the overwhelming
jurisprudence of other circuit courts, and (3) the Fourth
Circuit's own opinions all require the use of "materially
adverse action" when defining the adversity element of a

retaliation claim, rather than the "adverse employment action" element of discrimination claims.

However, even in the wake of White and Davreau, a significant subset of Fourth Circuit cases continued reciting "adverse employment action" as an element of Title VIII retaliation claims. This misstatement of law tends to occur in one of two ways. In the first set, the decision recites "adverse employment action" as the second element of a retaliation claim, without qualification. E.g., Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 429 (4th Cir. 2015).[19] In the second set, the decision recites "adverse employment action" as the second element of a retaliation claim, but then introduces "materially adverse action" language as a modifier for "adverse employment

---

[19] See also Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015); Engler v. Harris Corp., 628 F. App'x 165, 167 (4th Cir. 2015); Stewart v. Morgan State Univ., 606 F. App'x 48, 50 (4th Cir.), cert. denied, 136 S. Ct. 109, 193 L. Ed. 2d 88 (2015); Watt v. Mabus, 600 F. App'x 902 (4th Cir. 2015); Pettis v. Nottoway Cty. Sch. Bd., 592 F. App'x 158, 160 (4th Cir. 2014789 F.3d 422); Stokes v. Virginia Dep't of Corr., 512 F. App'x 281, 282 (4th Cir. 2013); Bryan v. Prince George's Cty., Md., 484 F. App'x 775, 776 (4th Cir. 2012); Francisco v. Verizon S., Inc., 442 F. App'x 752, 754 (4th Cir. 2011); Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd sub nom. Coleman v. Court of Appeals of Maryland, 132 S. Ct. 1327, 182 L. Ed. 2d 296 (2012); Reed v. Airtran Airways, Inc., 351 F. App'x 809, 810 (4th Cir. 2009); Wright v. Sw. Airlines, 319 F. App'x 232, 233 (4th Cir. 2009); Johnson v. Mechanics & Farmers Bank, 309 F. App'x 675, 684 (4th Cir. 2009); Freeman v. N. State Bank, 282 F. App'x 211, 218 (4th Cir. 2008); Johnson v. Wheeling-Pittsburgh Steel Corp., 279 F. App'x 200, 204 (4th Cir. 2008).

action. For example, one opinion in the second group recites that:

> [t]o establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he engaged in protected conduct; (2) his employer took an adverse employment action against him; and (3) the protected conduct was causally connected to the adverse action. Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008). To satisfy the second element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks and citation omitted)

Wells v. Gates, 336 F. App'x 378, 382-83 (4th Cir. 2009).[20]

---

[20] See also A Soc'y Without A Name v. Virginia, 655 F.3d 342, 352 (4th Cir. 2011); Harden v. Wicomico Cty., Md., 436 F. App'x 143, 145 (4th Cir. 2011); Gage v. Cort Bus. Servs., 410 F. App'x 725, 726 (4th Cir. 2011).

These decisions are at odds with White, Darveau, Caldwell, and Scurlock-Ferguson because they retain an employment action as a component of the second element of a Title VII retaliation claim. The distinction is not merely semantic. By reciting "adverse employment action" as an element of a retaliation claim without simultaneously reciting White's statement that such action need not affect the terms and conditions of employment, White, 548 U.S. at 63, these types of decisions perpetuate the misconception that an adverse action must be an employment action to state a retaliation claim. E.g., Morales v. Gotbaum, 42 F. Supp. 3d 175, 202 (D.D.C. 2014) (properly reciting material adversity as an element of prima facie claim for discrimination, but requiring change in the terms or conditions of employment to state a claim for retaliation based on denial of training).

Coleman (on which VUU relies) is among the first group of decisions. See infra note 19. There, relying on the pre-White case of Mackey v. Shalala, 360 F.3d 463, 469 (4th Cir. 2004), the Fourth Circuit stated that "the elements of a prima facie retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." Coleman, 626 F.3d at 190. The Supreme Court affirmed Coleman on appeal, but only on the question of sovereign immunity; the Supreme Court did not consider the Fourth Circuit's recitation of the elements of a Title VII retaliation claim. Coleman, 132 S. Ct. at 1327. The Fourth Circuit's opinion in Coleman subsequently became a popular citation for the elements of a retaliation claim. See, e.g., Engler v. Harris Corp., 628 F. App'x 165, 167 (4th Cir. 2015); Clarke v. Virginia State Univ., No. 3:15-CV-374, 2016 WL 521528, at *4 (E.D. Va. Feb. 5, 2016).[21] According to WestLaw's Keycite statistics, 200 cases cite Coleman for the elements of retaliation, including ten Fourth Circuit opinions and 190 opinions by district courts within the Fourth Circuit; none of the citations are flagged as

---

[21] This Court is among those courts that have cited Coleman for the "adverse employment action" standard repeatedly in retaliation cases.

negative.[22] By contrast, Darveau's recitation of the new
"materially adverse action" standard has been cited only cited
51 times, and only 34 of those citations are by courts within
the Fourth Circuit.[23] Notwithstanding the fact that it
contradicts the Supreme Court, other published decisions of the
Fourth Circuit, and published opinions of sister circuits,
Coleman has exerted an outsized gravitational pull on
retaliation jurisprudence in the Fourth Circuit, pulling the
Fourth Circuit and its district courts off course set by the
Supreme Court in White andapplied in Darveau, Caldwell, and
Scurlock-Ferguson.[24]

---

[22] This statistic was generated by retrieving Coleman, scrolling
to Headnote 3, and selecting "200 Cases that cite this
headnote." Citing References, **WestLaw**,
https://1.next.westlaw.com/Link/RelatedInformation/DocHeadnoteLi
nk?docGuid=I44842868ece211df852cd4369a8093f1&headnoteId=20236486
3800320140205014441 (accessed Apr. 27, 2016).

[23] This statistic was generated by retrieving Darveau, scrolling
to Headnote 7, and selection "51 Cases that cite this headnote."
Citing References, **WestLaw**,
https://1.next.westlaw.com/Link/RelatedInformation/DocHeadnoteLi
nk?docGuid=Id2abd68fd04511dcb6a3a099756c05b7&headnoteId=20149629
0400720080507223305 (accessed Apr. 27, 2016).

[24] For whatever reason, other Courts of Appeals also occasionally
use "adverse employment action" in retaliation claims with
varying levels of frequency. E.g., Garayalde-Rijos v.
Municipality of Carolina, 747 F.3d 15, 24 (1st Cir. 2014); Ya-
Chen Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir.
2015); Barnett v. New Jersey Transit Corp., 573 F. App'x 239,
244 (3d Cir. 2014), cert. denied, 135 S. Ct. 1493 (2015); Dailey
v. Shintech, Inc., 629 F. App'x 638, 642 (5th Cir. 2015); Crane
v. Mary Free Bed Rehab. Hosp., No. 15-1358, 2015 WL 8593471, at
*7 (6th Cir. Dec. 11, 2015); Jaburek v. Foxx, 813 F.3d 626, 633

In many cases – perhaps the overwhelming majority of cases – the distinction between "adverse employment action" and "materially adverse action" is unlikely to change the outcome of a case. For example, terminating the employment of an employee is so adverse that it is difficult to imagine a case where firing an employee would not be both "materially adverse action" and also an "adverse employment action." On the other side of the adversity spectrum, as discussed below, a reprimand without collateral consequences is so marginally adverse that it qualifies as neither "materially adverse" nor "adverse employment action." There is, however, a non-negligible subset of cases on which the broader standard of White covers some actions but not others, particularly where the impact of the adverse action is not felt in the employment setting or does not affect the conditions of employment. See, e.g., White at 64-65. This is particularly significant in this case, because VUU's refusal to allow Hinton to take classes, depending on the facts, could be so materially adverse that it would deter a reasonable employee from engaging in protected activity, even though the

---

(7th Cir. 2016); Rebouche v. Deere & Co., 786 F.3d 1083, 1088 (8th Cir. 2015) (using hybrid "materially adverse employment action"); Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1034-35 (9th Cir. 2006); Unal v. Los Alamos Pub. Sch., No. 15-2055, 2016 WL 360758, at *10 (10th Cir. Jan. 29, 2016); Jackson v. Alabama Dep't of Corr., No. 15-12441, 2016 WL 696998, at *4 (11th Cir. Feb. 22, 2016).

lack of impact on the terms of Hinton's employment means that such action is not an adverse employment action.

Thus, it is necessary, in this case, to come to terms with the effect of conflicting circuit precedent. Ordinarily, the only way to resolve such conflict is an en banc decision by the Fourth Circuit. However, considering that the Supreme Court has already decided the issue in White and that the Fourth Circuit has followed White in a sizeable set of cases, the correct course in this case is to follow the explicit holding of the Supreme Court in White, along with the decisions of the Fourth Circuit that note and apply the White decision as the law of the circuit.

In sum, to state a prima facie case for retaliation under White, a plaintiff must allege: (1) engagement in protected activity, (2) "materially adverse action ... which ... might well have dissuaded a reasonable worker form making or supporting a charge of discrimination," and (3) causality. White, 548 U.S. at 68; Mascone, 404 F. App'x at 765.

### 2. Refusal to Allow Class-Taking At VCU Could Constitute Material Adversity; Green's Reprimands Did Not Constitute Material Adversity

Under the material adversity standard, reprimands, standing alone and without collateral consequences, are not materially

adverse. However, denial of class-taking privileges is plausibly materially adverse so as to preclude dismissal.

### (a)   Reprimands Are Not Materially Adverse

Even under the comparatively lax "materially adverse" standard, the reprimands in August and September of 2013, as pleaded, do not state a materially adverse action of the sort that would dissuade a reasonable employee from engaging in protected activity.[25]

First, this Court's independent analysis shows that a reprimand without attached collateral consequences is not "materially adverse" under the guiding principles of White. As the Supreme Court noted, even the comparatively lax standard "materially adverse" has its limits.

> [I]t is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." ... An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, **Employment Discrimination Law** 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The antiretaliation provision seeks to prevent

---

[25] The parties did not actually brief whether the reprimand was "materially adverse," presumably because they, like many others, believed that discrimination and retaliation followed the same "adverse employment action" standard.

> employer interference with "unfettered
> access" to Title VII's remedial mechanisms
> .... It does so by prohibiting employer
> actions that are likely "to deter victims of
> discrimination from complaining to the
> EEOC," the courts, and their employers ...
> And normally petty slights, minor
> annoyances, and simple lack of good manners
> will not create such deterrence.

White, 548 U.S. at 68. This Court finds that reprimands without

collateral consequences are akin to non-actionable snubbing,

antipathy, and petty slights. They cause no detriment –

employment-related or otherwise – besides the bruised feelings

which "all employees experience" on occasion. Thus, reprimands

without collateral consequences cannot be characterized as

"adverse." Because reprimands without collateral consequences

are not adverse, they would not dissuade a reasonable employee

from engaging in protected activity, and cannot supply the

adversity element of a Title VII claim for retaliation.

Second, courts within the Fourth Circuit have reached the

same conclusion that reprimands, without collateral

consequences, are not "materially adverse." In Wright v. Kent

Cty. Dep't of Soc. Servs., No. CIV.A. ELH-12-3593, 2014 WL

301026, at *14 (D. Md. Jan. 24, 2014), the court held that

> "[t]he anti-retaliation provision of Title
> VII does not protect against 'petty slights,
> minor annoyances, and simple lack of good
> manners.'" Geist    v.    Gill/Kardash
> Partnership, 671 F. Supp. 2d 729, 738
> (D.Md.2009) (quoting [White, 548 U.S. at
> 64]). Moreover, Title VII's "antiretaliation

> provision protects an individual not from
> all retaliation, but from retaliation that
> produces an injury or harm." [White, 548
> U.S. at 67.] As Judge Paul Grimm of this
> Court recently noted, even under the "lower
> bar" applicable to Title VII retaliation
> claims, "none of the following constitutes
> an adverse employment action in a
> retaliation claim: failing to issue a
> performance appraisal; moving an employee to
> an inferior office or eliminating the
> employee's work station; considering the
> employee 'AWOL'; or issuing a personal
> improvement plan, 'an "Attendance Warning,"
> ' a verbal reprimand, 'a formal letter of
> reprimand,' or 'a proposed termination.' "
> Wonasue v. University of Maryland Alumni
> Ass'n, ---F.Supp.2d ----, 2013 WL 6158375,
> at *10 (D.Md. Nov. 22, 2013) (quoting Rock
> v. McHugh, 819 F.Supp.2d 456, 470-71 (D. Md.
> 2011)).

Wright v. Kent Cty. Dep't of Soc. Servs., No. CIV.A. ELH-12-3593, 2014 WL 301026, at *19 (D. Md. Jan. 24, 2014) (emphasis added); accord Thorn, 766 F. Supp. 2d at 603 (observing briefly that "unwarranted reprimands" in the form of "letters of counseling" was not materially adverse because they would not dissuade a reasonable employee from engaging in protected activities).[26] Additionally, an unpublished opinion of the Fourth Circuit found that "poor performance reviews" were not

---

[26] Wright and Thorn fall in the set of decisions – in the vein of Wells, 336 F. App'x at 382-3, discussed above – which cite "adverse employment action" as an element of a retaliation claim, but which then analyze the allegedly adverse action under the proper "materially adverse" standard. However, even though Wright and Thorn recite the wrong element, the cases tend to support this Court's independent conclusion that reprimands are not materially adverse.

materially adverse, Parsons v. Wynne, 221 F. App'x 197, 198 (4th Cir. 2007), and one district court subsequently equated poor performance reviews and reprimands. Wright, 2014 WL 301026, at *14.[27] Indeed, the terseness and brevity with which these courts disposed of reprimands under a materially adversity analysis tends to indicate that courts consider reprimands so clearly non-actionable that the subject does not merit extensive analysis.

Third, appellate courts outside this circuit have also found that reprimands without collateral consequences are not materially adverse actions.[28] For example, the First Circuit explained that:

> [w]e have found before that a reprimand may constitute an adverse action, Billings v. Town of Grafton, 515 F.3d 39, 54-55 (1st Cir. 2008), but the reprimands at issue here are tamer beasts than the one in Billings. Specifically, none of the reprimands here can be said to be material because none carried with it any tangible consequences. Rather, each was merely directed at correcting some workplace behavior that

[27] But cf. Belyakov v. Leavitt, 308 F. App'x 720, 729 (4th Cir. 2009) (holding that reprimand when combined with termination materially adverse enough as to dissuade a reasonable person from engaging in protected activity). Belyakov does not govern here because, as discussed above, Hinton has not pled any consequences related to or potentially stemming from his reprimands.

[28] Unlike Wright and Thorn, this set of cases use the correct "materially adverse" element and, even employing this lower bar, all of these cases conclude that reprimands without collateral consequences do not establish material adversity.

> management perceived as needing correction;
> her working conditions were never altered
> except in the positive direction. Bhatti may
> well be right that these reprimands were
> undeserved—indeed, she presents enough
> evidence that we may safely presume her to
> be blameless (or nearly so) in each instance
> for summary judgment purposes — but a
> criticism that carries with it no
> consequences is not materially adverse and
> therefore not actionable. In the end, this
> means her retaliation claim fails as a
> matter of law.

Bhatti v. Trustees of Boston Univ., 659 F.3d 64, 73 (1st Cir.

2011); accord Perry v. Rogers, 627 F. App'x 823, 832-33 (11th

Cir. 2015) ("Perry has failed to set forth any evidence showing

how this written reprimand negatively affected her in a material

way"), cert. denied sub nom. Aaron v. Alabama Alcoholic Beverage

Control Bd., 136 S. Ct. 1228 (2016); Noack v. YMCA of Greater

Houston Area, 418 F. App'x 347, 353 (5th Cir. 2011) ("Noack

claims that he was given a written reprimand for working

unauthorized overtime ... Noack, however, admitted that he did

not suffer any 'significant harms' ... He only claims that he

'sometimes ... wound up working extra'"); Allen v. Am.

Signature, Inc., 272 F. App'x 507, 511 (7th Cir. 2008). The

Tenth Circuit is an outlier on this issue. Hamby v. Assoc. Ctrs.

For Therapy, 230 Fed. App'x 772, 778 (10th Cir. 2007) ("Hamby

began receiving an increased number of reprimands, a challenged

action which a reasonable employee would find materially

adverse.").

In sum, this Court's own analysis under the governing
principles of White, other cases from within the Fourth Circuit,
and the decisions of other appellate courts all demonstrate that
allegation of a reprimand, without alleging any other adverse
consequences, does not properly plead the type of materially
adverse action that would deter a reasonable worker engaging in
protected activity and thus does not statisfy the adversity
element of a Title VII retaliation claim.  Hence, to the extent
that Count II is based on the August and September 2013
reprimands, Count II fails to allege a cognizable claim for
Title VII retaliation.

### (b) Denial Of Class-Taking Privileges Can Be Materially Adverse Depending On Facts

The importance of the distinction between Coleman's
"adverse employment action" standard and White's "materially
adverse action" standard becomes significant when considering
whether denial of classes can serve as the basis for Title VII
retaliation claim.  VUU argues that Hinton "fails to allege how
being denied the opportunity to take [VCU] classes had any
impact on his employment at VUU or would otherwise dissuade a
reasonable employee from engaging in a protected activity."
(Def.'s Reply 13) (emphasis added); see also (Def.'s Mem. 12-13)
(reciting the "adverse employment action" standard in the
retaliation context).  Under White, Hinton is not required to

plead that his employer's misconduct "had any impact on his employment." Instead, the only inquiry is whether VUU's misconduct was so materially adverse as to dissuade a reasonable employee from engaging in protected activity. The cases that VUU cites for the proposition that denial of class-taking opportunities would not deter a reasonable employee are largely unpersuasive.

First, the cases upon which VUU relies for the proposition that denial of class-taking opportunities are not materially adverse are unpersuasive because they are tainted by reference to the higher standard of "adverse employment action," in contradiction of White's clear statement that impact on terms of employment is not necessary to establish material adversity. For example, VUU cites Chapman for the proposition that denial of training opportunities is not materially adverse. However, Chapman relies upon the improper "adverse employment action" standard.

> To make out a prima facie case of
> discrimination under Title VII, the
> plaintiff must show that: (1) she is a
> member of a protected class; (2) her job
> performance was satisfactory; (3) an adverse
> employment action was taken against her; and
> (4) similarly-situated employees outside the
> protected class received more favorable
> treatment .... To make out a prima facie
> case of retaliation under Title VII, a
> plaintiff must show that: (1) she engaged in
> protected activity; (2) she suffered an
> adverse employment action; and (3) a causal

54

connection existed between the protected activity and the adverse employment action.

Plaintiff Chapman's Title VII claims based on ... denial of training opportunities and developmental work assignments ... fail because Chapman has failed to show that these actions had a significant detrimental effect on her or her employment status or were otherwise materially adverse. None of these actions altered the terms or benefits of Chapman's employment, and, therefore, none can satisfy the adverse employment action element of a Title VII discrimination claim. Further, none of these actions can satisfy the adverse action element of a Title VII retaliation claim because none was so detrimental that a reasonable employee would have been dissuaded from reporting discrimination as a result. Thus, Chapman fails to support the adverse action element of either a discrimination or retaliation claim under Title VII.

Chapman v. Geithner, No. 1:11-CV-1016 GBL/TRJ, 2012 WL 1533514, at *15, *22 (E.D. Va. Apr. 30, 2012) aff'd, 507 F. App'x 299 (4th Cir. 2013). VUU's reliance on Chapman is problematic, because Chapman improperly recites the elements of a prima facie retaliation claim, and appears to inject a question of "effect on employment status" into both Title VII discrimination claims and Title VII retaliation claims. Because "materially adverse action" analysis is distinct from "adverse employment action" and does not require any "effect ... on employment status," the Court cannot accept Chapman as dispositive as to the material adversity (or lack thereof) of Hinton's denial of classes. VUU's other citation suffers from similar flaws. In Napolitano, the

court held that "[d]enial of training opportunities is materially adverse only if there is a 'material change in ... employment conditions, status, or benefits .... Plaintiff has not alleged any significant change in her employment or 'objectively tangible harm' as a result of not receiving these training opportunities." Allen v. Napolitano, 774 F. Supp. 2d 186, 204 (D.D.C. 2011) (internal citations omitted). Although Napolitano correctly used "materially adverse action" to define the second element of a prima facie claim for retaliation, it improperly attached "change in employment conditions" as a requirement for actionability. The injection of requirement is at odds with White's holding that a retaliation claim need not plead material changes to employment conditions.[29]

---

[29] The problems presented by Chapman (incorrect statement of prima facie case) and Napolitano (improper requirement of effects on employment) appear fairly common across cases considering denial of training. E.g., Loomis v. Starkville Mississippi Pub. Sch. Dist., No. 114CV00159DMBDAS, 2015 WIL 9125943, at *16 (N.D. Miss. Dec. 15, 2015); Johnson v. Watkins, 803 F. Supp. 2d 561, 571-72 (S.D. Miss. 2011), Riley v. Delaware River & Bay Auth., 661 F. Supp. 2d 456, 470-71 (D. Del. 2009), Sekyeye v. City of New York, No. 05 CIV. 7192BSJDCF, 2009 WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009); Beaumont v. Texas Dep't of Criminal Justice, 468 F. Supp. 2d 907, 929-30 (E.D. Tex. 2006).

Certainly, the White Court contemplated that effect on employment was a factor tending to make a given action "materially adverse." E.g., White, 548 U.S. at 68 (contemplating denial of training lunches as material adversity). Just as certainly, the White Court rejected the notion that effect on employment is a necessary predicate for establishing material adversity. Id. at 63-67.

Second, one of the cases upon which VUU relies actually left open the possibility that denial of class-taking constituted "material adversity." In its opening brief, VUU relied on Blomker v. Jewell, No. CIV.A. 14-174 JRT/TN, 2015 WL 853617, at *8 (D. Minn. Feb. 26, 2015) for the proposition that not providing classes could never rise to the level of material adversity. Blomker does not reach as far as VUU claims.

> While being denied the opportunity to take classes may be a nascent instance of damaging "an employee's future career prospects," see [Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs., 728 F.3d 800, 804 (8th Cir. 2013)], there is no allegation that being denied this opportunity was a change from how Plaintiff was treated before she filed her EEO complaints.

Id. at *8.[30] That is: the plaintiff failed to allege retaliation, and the court did not rule on whether being denied the opportunity to take classes constituted material adversity.

Third, Hinton's citation - even though it recites the stricter standard of "adverse employment action" — is most in line with the Supreme Court's decision in White. Hinton relies principally on Kennedy v. Virginia Polytechnic Inst. & State Univ., 781 F. Supp. 2d 297, 304 (W.D. Va. 2011). In Kennedy, the plaintiff stated that:

---

[30] Jackman held that denial of the ability to take classes was not "adverse employment action" in the context of discrimination.

> she suffered adverse employment actions in
> that Virginia Tech unnecessarily reprimanded
> her by changing her agreed performance
> criteria without notice, required her to
> meet objectively impossible benchmarks,
> denied her important training opportunities,
> and insisted that she provide copies of
> business trip receipts when Virginia Tech
> lost the originals .... the Court cannot
> conclude, as a matter of law, that a
> reasonable jury could not find that Kennedy
> suffered an adverse action.

Id. at 304. Kennedy is in line with White, where the Supreme

Court has explicitly noted that denying opportunities for

professional advancement is likely to meet the "materially

adverse so as to deter a reasonable person from engaging in

protected activities" standard in most situations. White, 548

U.S. at 69. There is certainly a clear distinction between

training and generally "taking classes," in that "classes" can

be completely unrelated to professional development (e.g., an

attorney taking painting classes). However, White makes clear

that professional development and opportunity for advancement

are not dispositive in a "materially adverse" analysis.

Instead, the question is whether a reasonable employee, knowing

that he might be deprived of the benefit of taking classes for

engaging in protected activity, would be deterred from engaging

in that protected activity.

In response to that question, it cannot be said, as a

matter of law, that a reasonable person would not be deterred

58

from engaging in protected activity with the prospect of losing class-taking privileges on the line. Such an imposition goes beyond the incivility, ordinary tribulations, petty slights, minor annoyances, personality conflicts, snubbing, or lack of manners which the White Court intended to exclude from the realm of "material adversity." White, 548 U.S. at 68. Rather, drawing all assumptions in Hinton's favor, it is plausible that denial of such an opportunity for personal enrichment is sufficiently materially adverse so as to deter a reasonable employee from engaging in protected activity.

Applying the "materially adverse" standard of White and Mascone rather than the "adverse employment action" of Coleman, Hinton has adequately pled that VUU engaged in materially adverse action against him. Whether that turns out to be so must abide factual development.

### (c)  Short-Term Denial Affects "Materiality," But Requires Factual Development

VUU argues that, even if inability to take classes is "materially adverse," short-term actions, such as the one at issue here, are less likely to dissuade a reasonable person than permanent actions, such that short term denial of classes would not dissuade a reasonable employee from engaging in protected activities. (Def.'s Reply 13 n.9); see also Cole v. Hill Phoenix, 3:12-cv-00621-HEH (Docket No. 12), 7 (E.D. Va. Feb. 7,

59

2013) (finding that delayed paycheck did not constitute material adversity where human resources department acted as soon as informed). Because Hinton's subsequent supervisor permitted Hinton to take classes, VUU argues that the denial of classes was so brief (and thus immaterial) that it would not deter a reasonable employee.

In this case, however, it is unclear how long Green served as Hinton's supervisor. (Compl. ¶ 19). A year of deprivation is considerably different than a month of deprivation. On the facts as pled, VUU's brevity argument is not persuasive one way or the other, and, at this stage, does not support dismissal.

### 3.    Hinton Sufficiently Stated A Causal Link

To state a claim for retaliation, plaintiff must plead a causal link between the protected activity and the employment action. E.g., Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). A "causal link" requires that the employer knew of the protected activities and that a reasonable temporal connection exists between the protected activities and the materially adverse misconduct. Id.

Because the August and September 2013 reprimands were not materially adverse action, it is necessary to consider only the causal links between Hinton's protected activities (two 2008 EEOC activities, Hinton's May 2013 complaint about equal pay,

and Hinton's September 2013 EEOC filing) and the remaining materially adverse actions (denial of class-taking privileges.)

> **(a) Hinton Sufficiently Alleges Green's Knowledge Of The 2008 and May 2013 Protected Activity, But Not The September 2013 Activity**

Hinton has sufficiently alleged Green's knowledge of the 2008 and May 2013 protected activities, but not the September 2013 activities. Holland, 487 F.3d at 218. First, Hinton explicitly alleges that Green knew about Hinton's 2008 EEOC charge. (Compl. ¶ 11). Second, although Hinton does not explicitly allege that Green knew about Hinton's 2013 internal complaint about unequal pay, Hinton alleges generally that, before becoming Hinton's supervisor, "Green was well aware of Hinton's past outspoken support for his own civil rights" in part because Hinton frequently conversed with Green's assistant "about their lives and VUU matters." (Compl. ¶ 11). This statement provides facts from which the Court can reasonably infer – making all reasonable inferences in favor of the defendant – that Green was aware of Hinton's May 2013 activities.

However, Hinton has not pled any facts which even tend to indicate that Green was aware of the September 2013 EEOC filing. As a result, Hinton's claim will be dismissed to the extent that it pleads retaliation for the September 2013 protected activity.

> **(b)  Hinton's Claim Is Not Barred By Lack of Temporal Proximity Because Hinton Pleads That Green Retaliated At The "First Opportunity" And That Green Acted On Continuing Animus**

When pleading a sufficient case, either the retaliation must closely follow the protected activity <u>or</u> the plaintiff must put forth a sufficient explanation for the time elapsed between the protected activity and the alleged retaliation.

> Save for situations in which the adverse employment decision follows the protected activity "very close[ly]," "mere temporal proximity" between the two events is insufficient to satisfy the causation element of the prima facie requirement. <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (internal quotations omitted). Although neither we nor the Supreme Court have adopted a bright temporal line, we have held that a three- or four-month lapse between the protected activities and discharge was "too long to establish a causal connection by temporal proximity alone," <u>Pascual v. Lowe's Home Ctrs., Inc.</u>, 193 Fed. Appx. 229, 233 (4th Cir. 2006) (unpublished). Even a mere ten-week separation between the protected activity and termination "is sufficiently long so as to weaken significantly the inference of causation between the two events." <u>King v. Rumsfeld</u>, 328 F.3d 145, 151 n. 5 (4th Cir. 2003). Where the time between the events is too great to establish causation based solely on temporal proximity, a plaintiff must present "other relevant evidence ... to establish causation," such as "continuing retaliatory conduct and animus" in the intervening period. <u>Lettieri v. Equant Inc.</u>, 478 F.3d 640, 650 (4th Cir. 2007).

Perry v. Kappos, 489 F. App'x 637, 643 (4th Cir. 2012).[31]

As to September 2013 EEOC filing, it is difficult to tell from the Complaint how much time passed between the protected activity (September 10, 2013) and the time when Green prohibited Hinton from taking classes (unspecified). The absence of a date on which Hinton was forbidden from taking classes makes it impossible for the Court, even drawing "all plausible inferences" in Hinton's favor from the facts as alleged, to find that Hinton was forbidden from taking classes in retaliation for the September 2013 EEOC complaint.    Thus, Count II must be dismissed in part as it pertains to denial of class-taking privileges being retaliation for Hinton's September 2013 EEOC charge.

That leaves a question of whether Hinton's 2008 and May 2013 protected activity are so far removed from Green's refusal to allow Hinton to take classes (which occurred, at the earliest, in August 2013, when Green became Hinton's supervisor) to serve as the basis for a sufficiently pled retaliation claim. Hinton can only overcome the extended period of time between the protected activity and the alleged retaliation if Hinton pleads other relevant facts. Perry, 489 F. App'x at 643.

---

[31] Although unpublished, Perry presents a succinct summary of published opinions.

Hinton proffers such other relevant facts under a "first opportunity to retaliate" theory: that Green took materially adverse action against Hinton at the first opportunity after she acquired power over Hinton. (Pl.'s Opp. 14-15). "First opportunity" is typically part of rehiring jurisprudence. E.g., Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) (assuming, without deciding, "that in the failure-to-hire context, the employer's knowledge coupled with an adverse action taken at the first opportunity satisfies the causal connection element of the prima facie case"); see also Templeton v. First Tennessee Bank, N.A., 424 F. App'x 249, 251 (4th Cir. 2011). However, "first opportunity" does not arise only in rehiring cases. E.g., Martin v. Mecklenburg Cty., 151 F. App'x 275, 280 (4th Cir. 2005) ("A decisionmaker's inconsistent action in violation of well-established policy, rendered at the first opportunity after becoming aware of protected conduct, provides sufficient evidence for a reasonable jury to conclude at the very least that some consideration of this protected conduct played a role in the contested employment decision"; permitting an eleven-month gap between protected conduct and alleged retaliation); see also Johnson v. Scott Clark Honda, No. 3:13-CV-485-RJC-DCK, 2014 WL 1654128, at *4 (W.D.N.C. Apr. 25, 2014), aff'd, 584 F. App'x 180 (4th Cir. 2014) (applying "first opportunity" to employee's request to become a full time employee). It is a

64

logical extension of the "first opportunity" rule as employed in Martin to find that Hinton has stated a claim for retaliation because: (1) Hinton engaged in protected activity in 2008 and in May 2013; (2) Green retaliated by forbidding Hinton from taking classes; and (3) Green retaliated (a) at her first opportunity to exercise authority over him and (b) at the first opportunity that he made a request (the request to take classes) that she could deny.

Additionally, Letteri establishes that "continuing animus" is one type of "other relevant evidence" that can establish causation notwithstanding a significant intervening period. Lettieri, 478 F.3d at 650. Hinton has pled continuing animus (Compl. ¶ 18), making a causal link even more probable on the basis of the facts as pled.

VUU argues that application of the "first opportunity" theory is "implausible." (VUU Reply 11) ("this Court would have to take the leap that Dr. Green was lying in wait for five years [and then] seized on the opportunity to retaliate ... The Court would likewise need to find that Dr. Green, for five years, restrained herself from harassing Hinton as a co-worker working in close proximity, despite her discriminatory animus."). The combination of "first opportunity" and "continuing animus," however, allows a plausible inference from the facts as pled that there was a causal link between Hinton's protected

activities and Green's denial of the opportunity to take classes, and plausibility is all that is required in the face of a motion to dismiss.

For the foregoing reasons, the motion to dismiss Count II will be granted as it pertains to: (1) the August and September 2013 reprimands; and (2) the refusal to allow class-taking as retaliation for the September 2013 EEOC complaint. However, the motion to dismiss Count II will be denied as it pertains to the refusal to allow class-taking as retaliation for the 2008 EEOC activity and the May 2013 internal complaint.

## C.    Count III: Title VII Retaliatory Harassment

For the reasons stated below, Count III will be dismissed in its entirety.

A prima facie[32] claim for retaliatory harassment[33] requires establishing the same facts as a retaliation claim, save that the "materially adverse" element is replaced by "subjected to severe or pervasive retaliatory harassment by a supervisor." Laster v. City of Kalamazoo, 746 F.3d 714, 731 n.5 (6th Cir. 2014), reh'g denied (Apr. 2, 2014)); see also Boyer-Liberto v.

---

[32] As discussed above, Hinton has not pled facts sufficient to allow him to proceed under the "direct" method on his retaliation and retaliatory harassment claims.

[33] Retaliatory harassment is sometimes known as "retaliatory hostile work environment." E.g., Thorn, 766 F. Supp. 2d at 600.

Fontainebleau Corp., 786 F.3d 264, 283 (4th Cir. 2015).[34]
Therefore, to state a prima facie claim for retaliatory
harassment, Hinton must plead: (1) engagement in a protected
activity; (2) that he was subjected to severe or pervasive
retaliatory harassment by a supervisor; and (3) a causal link
between the protected activity and the harassment. White, 548

---

[34] The continued improper use of "adverse employment action" in
Fourth Circuit opinions impacts the way that courts within the
Fourth Circuit think about the kind of conduct which suffices to
prove retaliatory harassment. E.g., Sonnier v. Diamond
Healthcare Corp., 114 F. Supp. 3d 349, 360 (E.D. Va. 2015)
(discussing retaliatory harassment in terms of effect on terms
of employment).
    The Sixth Circuit uses a slightly different test for
retaliation claims than the Fourth Circuit, but the slight
difference is not so material that the Sixth Circuit's decisions
are not an appropriate guide for what the Fourth Circuit would
do if the Fourth Circuit consistently used "materially adverse"
in its retaliation jurisprudence. The Fourth Circuit uses: (1)
protected action; (2) adverse employment action or materially
adverse action; and (3) causation. E.g., Coleman, 626 F.3d at
190. The Sixth Circuit uses: (1) protected action; (2) the
person taking materially adverse action knew of the protected
action; (3) materially adverse action; (4) causation. E.g.,
Laster, 746 F.3d at 731. In other words, the Fourth Circuit
bundles the bad actor's awareness into the causation element,
and the Sixth Circuit separates awareness and causation. The
tests are sufficiently similar that the Sixth Circuit is an
appropriate model for prima facie claims of retaliatory
harassment in the wake of White.
    Moreover, the Sixth Circuit's "subjected to severe or
pervasive retaliatory harassment by a supervisor" is in line
with the Fourth Circuit's observance that severity and frequency
are highly significant to finding retaliatory harassment. Boyer-
Liberto, 786 F.3d at 283 (stating the incorrect and more
restrictive "adverse employment action" formulation of a prima
facie claim for retaliation). Thus, under both the Sixth and
Fourth Circuit formulations, severity and frequency underpin the
ultimate retaliatory harassment finding.

U.S. at 67; Boyer-Liberto, 786 F.3d at 283; Laster, 746 F.3d at 731; Mascone, 404 F. App'x at 765.

As to the first element, the only protected actions the Court may consider are Hinton's 2008 EEOC actions and his May 2013 internal complaint. As discussed in the previous section, the September 2013 EEOC charge cannot serve as the "protected activity" predicate, because: (1) it occurred after the August and September 2013 reprimands; and (2) Hinton has not pled facts sufficient for the Court to plausibly infer that Green learned of the September 2013 EEOC charge prior to engaging in allegedly harassing activities.

As to the third element, as discussed in the previous section, Hinton has sufficiently pled causation between his 2008 and May 2013 activities and Green's retaliation beginning in August 2013, because he alleges that Green retaliated at the first opportunity and alleges continuing animus.

Thus, the remaining and dispositive question is that of "severe or pervasive retaliatory harassment by a supervisor." Boyer-Liberto, 786 F.3d at 283; Laster, 746 F.3d at 731. Because Title VII does not protect against minor workplace harms, questions of "severity" should be considered in light of the Supreme Court's standard for retaliation: that a "reasonable employee would have found the challenged action materially adverse" such that a reasonable employee would be dissuaded from

engaging in protected activity. White, 548 U.S. 68. Under this test, there is a sliding scale of severity versus pervasiveness: a single instance of misconduct is sufficient when it is "physically threatening or humiliating," e.g., Boyer-Liberto, 786 F.3d at 268, but even numerous instances of misconduct will not establish retaliatory harassment when each instance of misconduct is minor. E.g., Thorn, 766 F. Supp. 2d at 601.

In this case, Hinton has alleged four instances of misconduct: two verbal reprimands, one written reprimand, and the denial of class-taking privileges. As previously discussed, the toothless reprimands of August and September 2013 are so minor that they would not dissuade a reasonable employee from engaging in protected activity. They are therefore entitled to no consideration in a "severe or pervasive" analysis. Moreover, although denial of class-taking privileges was sufficient to state a claim for retaliation, it is not the sort of "physically threatening or humiliating" misconduct that allows a single incident to support a retaliatory harassment claim. E.g., Boyer-Liberto, 786 F.3d at 268.

For the foregoing reasons, VUU's motion will be granted as it pertains to Count III, and Count III will be dismissed in its entirety.

## D.    Count IV: Equal Pay Act

Count IV will not be dismissed because Hinton has stated facts from which it may be reasonably inferred that he and the comparable female administrative assistants hold jobs that require equal skill, effort, and responsibility.

To successfully plead a prima facie case under the Equal Pay Act, a plaintiff must allege: (1) that his employer has paid different wages to employees of opposite sexes; (2) that said employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under similar working conditions." Gustin v. W. Virginia Univ., 63 F. App'x 695, 698 (4th Cir. 2003) (relying on Brinkley v. Harbour Recreation Club, 180 F.3d 598, 613 (4th Cir. 1999) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 189, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974))). Although "to make out a prima facie case under the EPA, the burden falls on the plaintiff to show that the skill, effort and responsibility required in her job performance are equal to those of a higher-paid" employee of the opposite sex, "[i]n interpreting the EPA, [e]qual means substantially equal." Wheatley v. Wicomico Cty., Maryland, 390 F.3d 328, 332 (4th Cir. 2004) (emphasis in original) (internal citations omitted).

In this case, Hinton has alleged that he is paid less than female administrative assistants. (Compl. ¶ 20). From Hinton's

allegations, the Court can reasonably infer that Hinton and the identified female administrative assistants perform their jobs under similar working conditions, in that Hinton and the identified female administrative assistants work in the same department. (Compl. ¶ 20).

VUU targets the second element: whether Hinton has pled facts from which it may reasonably be inferred that Hinton and the identified female administrative assistants "hold jobs that require equal skill, effort, and responsibility." (Def.'s Mem. 17-18; Def.'s Reply 16-18). Hinton pled that "[t]here are no differences in seniority, merit, quantity or quality of production" between Hinton or the female administrative assistance in the department. (Compl. ¶ 45).

VUU's attack on Hinton's pleading relies on Earl v. Norfolk State Univ., No. 2:13CV148, 2014 WL 583972, at *1 (E.D. "Va. Feb. 13, 2014). In Earl, the plaintiff – a male adjunct professor - relied on a "statistical analysis" of sample salaries of other adjunct professors at the university to plead the first element of a prima facie Equal Pay claim: that his own salary was lower than female adjunct professors across the university. Earl, 2014 WL 583972 at *1. Earl attempted to establish the second element of an Equal Pay claim by stating that he was "at least as qualified" as the female adjuncts, that the "responsibilities of the job were essentially equivalent,"

71

that he had "comparable qualifications and responsibilities, and skill" across the university. Earl, 2014 WL 583972, at *1, 5-6.[35] Earl did not specifically identify any of the alleged female comparators. Earl, 2014 WL 583972, at *5-6. The court, therefore, found that Earl "made no reference to the skills, effort, and responsibilities required of [him] or to those of the [female adjuncts]." Earl, 2014 WL 583972, at *6. "Therefore, no comparisons of their respective skills, effort, and responsibilities can be made ... Indeed, an Equal Pay Act plaintiff cannot rest on the bare allegation that [he] is receiving lower pay for equal work; [he] must also show that the comparison [he] is making is an appropriate one." Earl, 2014 WL 583972, at *6 (internal quotations omitted) (relying on Strag v. Bd. of Trs., 55 F.3d 943, 950 (4th Cir. 1985)). However, unlike this case, Earl was complicated by the facts that: (1) the plaintiff presented a statistical study, rather than identifying specific comparable individuals, and (2) the study covered the entire university, not a single department or office. Earl, 2014 WL 583972, at *1, 5. Because Earl failed to identify any alleged comparators, the court had no facts from which it could plausibly infer that the female adjuncts across the entire

---

[35] The equivalent in this case would be if Hinton had alleged that he was paid less than female administrative assistants across the university system, in completely in different departments, without adequately identifying any of these alleged comparators.

university held jobs which required equal skill, effort, or responsibility. Earl, 2014 WL 583972, at *1, 6.

Additionally, the decision in Earl seems to implicitly recognize that adjuncts across departments in a university are likely to have different qualifications, to teach classes which are more or less important to the university, to do research with greater or lesser importance to the university, to carry different workloads, and to produce different qualities of work product. By contrast, where Hinton has pled that the administrative assistants who work in the same department as him hold the same jobs, have the same qualifications, and produce the same work product, it is perfectly plausible, making all reasonable inferences in favor of Hinton, to find that the Complaint sufficiently alleges that Hinton and his female counterparts hold jobs that require equal skill, effort, and responsibility. Any contrary finding would elevate form over substance. Hinton has pled that the people who have the same job title as him, who work in the same department, who have the same qualifications, and who do the same work as him are paid differently than he is. Requiring Hinton to plead more - for example, listing the daily activities or qualifications of every administrative assistant in the department - is the sort of detail most appropriately determined in discovery. Requiring such granular detail at this stage is at odds with Fed. R. Civ.

73

P. 8's requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." Requiring that kind of detail is not required by Twombly and Iqbal.

Drawing all reasonable inferences from the facts as pled in favor of the plaintiff, it can plausibly be inferred that Hinton and the female administrative assistants hold jobs that require equal skill, effort, and responsibility. Thus, Count IV will not be dismissed.

## E.    Service of Process

Hinton filed his Complaint on September 18, 2015. Before December 1, 2015, Fed. R. Civ. P. 4(m) required plaintiffs to serve process on a defendant within 120 days after filing of a complaint. As of December 1, 2015, Fed. R. Civ. P. 4(m) requires service within 90 days after the complaint is filed. The Supreme Court's Order transmitting the proposed rules to Congress states that the amendments "shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." Order, Apr. 29 2015, available at http://www.supremecourt.gov/orders/courtorders/frcv15(update)_18 23.pdf. Hinton served his Complaint on January 14, 2016 (Def.'s Mem. 19), within the old 120-day window but out of the new 90-day window.

VUU argues that the new 90-day period should be applied because it is "just and practicable" to do so. (Def.'s Mem. 19-20). In particular, VUU argues that: (1) the proposed amendments were made public and were highly publicized in April 2015, months before Hinton filed his Complaint; and (2) VUU offered to waive service. (Def.'s Mem. 19).

However, VUU's facts establish, at most, that it would have been practicable for Hinton to comply with the new Fed. R. Civ. P. 4(m) governing service of process. These facts do not establish that it would be just to apply the new Fed. R. Civ. P. 4(m). As a general matter, Hinton is intuitively correct that it is unjust to expect parties to abide by deadline-setting rules that were not in effect when the clock began ticking on a particular activity. To support this intuitive conclusion, Hinton presents several district court decisions applying the old Fed. R. Civ. P. 4(m) to cases filed before December 1, 2015. (Pl.'s Opp. 19-20 n.13). VUU is correct that "none of the parties in [those] cases raised or argued for the amended version to apply," and the courts in question applied the old rule without any in-depth discussion. (Def.'s Reply 19). Nevertheless, this string of citations is useful to show that, if federal judges tend to believe the old Fed. R. Civ. P. 4(m) applies to cases filed before December 1, 2015, then it was reasonable for Hinton to believe that the old Fed. R. Civ. P.

4(m) would apply to his case. It would thus be unjust to hold Hinton to the newer and shorter standard. Additionally, in this particular case, dismissing would work a particular injustice, because the statute of limitations on the Title VII claim expired during the time permitted for service. (Pl.'s Opp. 20).

Because it would not be just to apply the new service deadline to this case, there is no need to determine whether Hinton showed the kind of "good cause" which would justify the Court in extending the time needed to serve the Complaint. (Def.'s Mem. 19-20).

Because it would not be just to apply the shorter service period, either as a general matter or in this particular case, the Court will not dismiss for insufficient service.

## CONCLUSION

For the reasons stated above, the MOTION TO DISMISS COMPLAINT (Docket No. 3) will be granted in part and denied in part. The motion will be granted as to Count I and Count III. The motion will be granted as to Count II as it pertains to: (1) claims based on the August and September 2013 reprimands; and (2) based on Hinton's protected actions in September 2013. The motion will be denied as it pertains to the portion of Count II alleging the materially adverse action of denying Hinton the opportunity to take classes, allegedly in retaliation for

76

Hinton's protected activities in 2008 and in May 2013.   The motion will be denied as to Count IV. The motion will be denied to the extent that it alleges non-compliance with the Federal Rules.


It is so ORDERED.


_____ /s/      *REP*_____

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  May __4__, 2016